IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Michael Stanley, | ) | Case No.: 11-03426-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | | |
| LaVaughn Stanley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 11-00357 |
| | ) | |
| Michael Stanley, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The matter before the Court is the <u>Defendant's Motion for Partial Summary Judgment</u> filed on May 23, 2012, by the defendant-debtor, Mr. Michael Stanley, Docket No. 26. After notice, a hearing was held on June 26, 2012. Appearing were Mr. Robert Keller, the attorney for the Defendant-Debtor and Ms. Pamela Wilson Cousins, the attorney for the plaintiff, Ms. LaVaughn Stanley.

The matters were submitted on the records in both this adversary proceeding and the debtor's main bankruptcy case, briefs of counsel with exhibits, and the pleadings in this proceeding. Based on its consideration of the same, the Court concludes that summary judgment should be entered in part for the defendant and in part for the plaintiff.

**I. Findings of Facts**

These facts were taken mostly from Ms. Stanley's brief and the supporting exhibits attached thereto. They are accepted as true for purposes of this summary judgment motion. Consequently, there exist for resolution no genuine issues of material facts.

The parties were married for 36 years. On September 24, 2009, Mr. Stanley filed an action for divorce in the state circuit court. The trial of the divorce action commenced on December 1, 2010. On the day the trial began, the parties entered into a settlement agreement. On December 16, 2010, the court entered a final judgment of

divorce which incorporated the parties' agreement. The pertinent parts of the Court's decree include:

### THIRD: RETIREMENT BENEFITS

Husband shall transfer to the Wife the sum of $6,873.23 as a lump sum payment from his 401 K, or at his option, shall pay a lump sum cash payment to Wife within thirty (30) days of the Final Judgment of Divorce. Payment shall be mailed directly to Attorney Pamela Wilson Cousins, 950 22"d Street, North, Suite 633 Medical Forum, Birmingham, AL 35203. The Court shall maintain jurisdiction of this matter until it is complete, unless a Qualified Domestic Relations Order is necessary.

### FOURTH: HEALTH INSURANCE

The Husband shall pay directly to Shealy & Holt, and to Eyemart Express the outstanding medical bills of the Wife as of December 1, 2010. Husband shall pay directly to the Wife the sum of$74.00 for oral surgery. See Exhibit 1 hereto attached. As of the Final Judgment of Divorce, the Wife shall be responsible for her own health and dental expenses.

### FIFTH: ALIMONY

The Wife is awarded a judgment against the Husband for past due alimony in the sum of eight hundred ($800.00) dollars. Husband shall pay said amount directly to the Wife within thirty (30) days. As to future alimony, each party waives its claim for alimony against the other.

### SIXTH: REAL PROPERTY

The real property located at: 9929 Bates Avenue, Birmingham, AL 35217, is hereby awarded to the Wife, La Vaughn Stanley. The Husband shall transfer his title to the Wife by QuitClaim Deed "Within fourteen (14) days of the Final Judgment of Divorce.

### SEVENTH: AUTOMOBILES

The Husband is awarded the 1998 Nissan Truck, the 1999 Boat and Trailer. The Wife is awarded the Camry. Husband is responsible for the outstanding indebtedness on the Camry through November 30, 2010. The Wife is responsible for the outstanding indebtedness on the Camry beginning December 1, 2010. Each party shall execute the documents necessary to transfer title on said vehicles.

## EIGHTH: DEBTS

Husband shall be responsible for all marital debts including: the Internal Revenue Service, First National Bank (Visa Card), the AT&T Card, the Discover Card, and the Bank of America (Bass Pro Shop Card) as of December 1, 2010. Husband shall indemnify and hold Wife harmless thereof

## NINTH: ATTORNEY'S FEES

Wife shall apply the sum of $6,878.23 received from the Husband's retirement benefits towards payment of her attorney's fee.


A.P. Doc. 27, Exhibit B.

On January 13, 2011, Mr. Stanley's attorney, Mr. Greg White, mailed the quitclaim deed, which transferred Mr. Stanley's interest in the Bates Avenue property to Ms. Stanley, to Ms. Stanley's attorney Ms. Cousins.

On January 16, 2011, according to Ms. Stanley's construction of the divorce decree, the deadline passed for Mr. Stanley to pay the $6,873.23, either out-of-pocket or from his retirement fund, to Ms. Stanley for her to pay her attorney. In contrast, at the time, Ms. Cousins and Mr. White were in the process of drafting a Qualified Domestic Relations Order (QDRO) to have that payment taken out of Mr. Stanley's retirement account at Publix.

On January 27, 2011, Ms. Cousins faxed a draft QDRO to Mr. White and asked him to review it. She also transmitted the QDRO to Publix and was informed by Ms. Angel Young, Publix's "Stock Programs Compliance Specialist," that the review of the document could take up to 90 days.

On February 8, 2011, Ms. Cousins faxed a request to Mr. White to ask Mr. Stanley if he would consider paying the $6,873.23 out-of-pocket.

On March 9, 2011, Ms. Cousins faxed Mr. White again, informing him that she had not heard from Publix about the proposed QDRO and indicated, in her opinion, Mr. Stanley was in contempt for failing to make the $6,873.23 payment by January 16, 2011.

On April 4, 2011, Ms. Young at Publix sent a letter to Ms. Cousins notifying her that the proposed QDRO which she had submitted on January 27, 2011, was legally insufficient.

3

On April 25, 2011, Ms. Cousins faxed a revised proposed QDRO to Mr. White and Publix.

On June 16, 2011, Ms. Cousins instituted a garnishment proceeding against Regions Bank, where Mr. Stanley had an account, to collect the $6,873.23.

On June 27, 2011, Ms. Young, on behalf of Publix, sent a letter to all concerned indicating that its review of the second proposed QDRO could take up to 90 more days. In response, Ms. Cousins faxed a letter to Ms. Young, seeking to expedite the matter.

On June 29, 2011, Regions Bank, in its answer to Ms. Stanley's garnishment, represented that it was holding $886.83 belonging to Mr. Stanley pending further orders of the circuit court.

On June 29, 2011, according to Ms. Stanley from information gleaned from Mr. Stanley's bankruptcy statement of affairs, Mr. Stanley paid his bankruptcy attorney, Mr. Robert Keller, $1,500.00, plus $299.00 court cost to file the present chapter 7 case, and another $50.00 for debt counseling.

On July 8, 2011, Ms. Young, on behalf of Publix, sent a letter to all concerned indicating that the second proposed QDRO was legally sufficient.

Also on July 8, 2011, Mr. Stanley filed his chapter 7 bankruptcy petition. Mr. Keller immediately notified Ms. Cousins of that fact and filed a suggestion of bankruptcy in the circuit court. Ms. Cousins accordingly filed a document releasing the garnishment on behalf of Ms. Stanley on July 13, 2011.

On July 21, 2011, the circuit court judge executed the QDRO.

Ms. Stanley filed the present adversary proceeding on July 26, 2011.

On July 27, 2011, Ms. Cousins advised Publix not to distribute any funds from Mr. Stanley's retirement fund pending orders of the bankruptcy court. By letter dated August 18, 2011, Publix responded that it intended to make the distribution mandated by the QDRO. Consequently, on September 27, 2011, Ms. Stanley received a check for $113.57 from Publix Super Markets, Inc. 401(K) Smart Plan, and on November 11, 2011, received another check in the amount of $6,043.11.

According to Ms. Stanley, Mr. Stanley was, when he filed for divorce, gainfully employed by Publix Super Market, Inc.. He earned $31,231.38 from Publix in 2007, plus $161,346.81 from certain investments. He earned $32,138.91 from Publix in 2008, plus $76,743.04 from certain investments. He earned $35,128 from Publix in 2009; earned $35,629.15 from Publix in 2010. And he earned $35,005.15 from Publix in 2011. His chapter 7 petition indicates that he currently grosses $3,223.60 in monthly income. She submitted documents which indicate that his Publix 401(k) was valued at

$6,873.23 on June 30, 2010, and $3,368.29 on May 8, 2012. Those records indicate also that as of December 31, 2011, Mr. Stanley's Employee Stock Ownership Program account contained 893.7776 shares of Publix stock valued at $22.70 per share.

Ms. Stanley indicates that at issue in the divorce was the investment money that Mr. Stanley received in 2007 and 2008, part of which was used to pay off their home mortgage of $39,600, but no accounting was ever concluded with respect to the remainder of those funds. It is apparent also that at issue in the divorce was her entitlement, vel non, to share in Mr. Stanley's ESOP and 401(k) accounts. But she settled her divorce action, ostensibly without insisting on any accounting for the investment funds received by Mr. Stanley in 2007 and 2008, and agreeing to accept only a small portion of the 401(k)/ESOP account.

During the marriage, both Mr. and Ms. Stanley were issued credit cards by First National Bank of Omaha (Visa Card), CitiBank (AT&T Universal Card), Discover Bank, and Bank of America (Bass Pro Shop Card) and had authority to charge purchases with those cards. The balance owed on the First National Bank card was $11,265.94 as of July 25, 2010. The balance owed on the AT&T Card was $27,463.27 as of December 16, 2010. The balance owed on the Discover Card was $9,996.22 as of July 6, 2010. Ms. Stanley does not know what the balance was on the Bank of America card when the divorce decree was entered.

In her adversary complaint, Ms. Stanley contends that the obligations imposed on Mr. Stanley by the divorce decree are nondischargeable by virtue of 11 U.S.C. § 523(a)(15). She also contends that by trying to discharge those obligations in his chapter 7 case, including the marital debts he incurred responsibility for, Mr. Stanley is guilty of bad faith, which should compel the dismissal of his case pursuant to 11 U.S.C. §§ 707(b)(1) & (3).

Ms. Stanley admits that Mr. Stanley has quitclaimed his interest in the Bates Avenue property to her. She admits that Mr. Stanley has paid part of the debt owed to Shealy & Holt and part of the debt owed to Eyemart Express. She admits that Mr. Stanley has paid the $800 in alimony and the $74 for the oral surgery. She admits that the Camry lease is not an issue as the lease has expired, and the car has been returned to the lessor. She admits that $6,156.68 has been transferred from Mr. Stanley's 401k/ESOP plan to her.

### II. Summary Judgment Standards

The standards for resolving issues within the context of a summary judgment motion are outlined in the Eleventh Circuit Court of Appeals decision in Fitzpatrick v.

City of Atlanta, 2 F.3d 1112 (11th Cir. 1993).[1] This Court has applied those standards in

---

[1] Those are:

### A. Introduction

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The substantive law applicable to the case determines which facts are material. The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor.

In Adickes v. Kress, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a genuine issue precluding summary judgment. The operation of this framework was modified significantly in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The current framework is set out below.

### B. Movant's Initial Burden

The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

#### 1. For Issues on Which Movant Would Bear Burden of Proof at Trial

As interpreted by this court sitting en banc, Celotex requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

6

### 2. For Issues on Which Non-Movant
### Would Bear Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show, that is, point out to the district court--that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

### C. Non-Movant's Responsibility Once
### Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

### 1. For Issues on Which Movant
### Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial--that is, such that no reasonable jury could find for the non-movant--should the movant be permitted to prevail without a full trial on the issues.

### 2. For Issues on Which Non-Movant
### Would Bear Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was

this proceeding.

### III. Conclusions of Law

### A. Section 523(a)(15) contentions

#### 1. The FNB, Discover, CitiBank and Bank of America debts

With the exception of the Shealy & Holt and Eyemart Express debts, Mr. Stanley concedes that section 523(a)(15) precludes his discharge of the obligations he owes to Ms. Stanley by virtue of the divorce decree, including his obligation to "be responsible for" the marital debts and to "indemnify and hold [Ms. Stanley] harmless" with respect to those debts. Consequently, Ms. Stanley is, with respect to that issue, entitled to judgment as a matter of law.

Indeed, Mr. Stanley could hardly take any other position given that section 523(a)(15) makes all nonsupport obligations incurred as a result of a divorce decree nondischargeable. Section 523(a)(15) includes:

> A discharge under section 727 ... of this title does not discharge an individual debtor from any debt — to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit....

11 U.S.C. § 523(a)(15).

Consequently, the debts owed by Mr. Stanley to Ms. Stanley are made nondischargeable as a matter of law by the statute; however, Ms. Stanley seeks additional relief under section 523(a)(15). She contends that the nondischargeability of Mr. Stanley's obligation, as between him and her, and his responsibility for the marital debts and to indemnify and hold her harmless with respect to any potential liability she

---

overlooked or ignored by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

2 F.3d 1115 -1117 (for the sake of clarity and brevity, internal quotation marks, citations, footnotes, indentations, brackets, and ellipses have been omitted).

8

may have for those debts, is insufficient. As such, she asks the Court to find that Mr. Stanley's personal, direct liability to the creditors to whom those debts are owed, which he incurred before and aside from the divorce decree, be declared nondischargeable, even though those creditors have not sought a declaration that their debts are nondischargeable. That presents a purely legal question which requires no resolution of any genuine issues of material fact to be answered, <u>except this explanation</u>. As Ms. Stanley's contention with respect to the IRS debt is moot because Mr. Stanley concedes the point that his personal obligation to pay the IRS is nondischargeable pursuant to 523(a)(1), only the debts owed to First National Bank of Omaha, Discover Bank, CitiBank (AT&T/Universal Card), and Bank of America, are still at issue here under Ms. Stanley's additional section 523(a)(15) argument. That argument is addressed below.

 First, Ms. Stanley has no standing to seek a declaration of nondischargeability of debts which are not owed to her. Second, this Court is without authority to declare a debt nondischargeable at the behest of anyone other than the creditor to whom the debt is owed, or, in the case of section 523(a)(15), to declare obligations nondischargeable which are not owed to a spouse, former spouse, or child of a debtor, or that were not incurred by a debtor during the course of a divorce or separation proceeding.

 Section 523(a)(15) makes nondischargeable only "debt[s] ... to a spouse, former spouse, or child of the debtor ...." The debts to First National Bank of Omaha, Discover Bank, CitiBank (AT&T/Universal Card), and Bank of America, which Mr. Stanley is made responsible for in the divorce decree, are not owed to Ms. Stanley but instead are owed to third-party creditors.

 In addition, the statute requires for nondischargeability that a debt have been "... incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record ...." The First National Bank, Discover, CitiBank and Bank of America debts were not incurred by the debtor in the course of the parties' divorce. Instead, he incurred them before the divorce decree was entered by virtue of contracts between himself and those creditors. They are not new obligations created by the divorce decree. He owed them without benefit of the decree and would have continued to owe them even if the decree had not been entered.

 The only new obligation created by the divorce decree with respect to those four debts was Mr. Stanley's promise to indemnify Ms. Stanley if the creditors to whom those debts are owed seek collection from her. <u>That obligation is not dischargeable by him and he does not contend otherwise</u>. However, he did not agree in his divorce action not to discharge his personal liability to those creditors and the divorce judgement imposes no such restriction on him. Moreover, his discharge of those debts will not eliminate his responsibility to pay one if Ms. Stanley is also personally liable for it and the creditor to whom it is owed tries to collect it from her, even though his

9

personal liability to pay that creditor will have been eliminated by his bankruptcy discharge. Moreover, he will still be subject, despite his bankruptcy discharge, to such remedies which may be available to Ms. Stanley under state law to protect herself, by enforcing the indemnity provisions of the divorce decree, from the collection efforts of any such creditors. See, e.g., Kaleta v. Kaleta, 452 So. 2d 1338, 1340 (Ala. Civ. App. 1984). In other words, while a creditor holding a marital debt for which the parties are jointly liable will be prohibited from collecting that debts from Mr. Stanley personally, Ms. Stanley is not subject to any such prohibition and is free to enforce the terms relating to such debt in the divorce decree even if it means that Mr. Stanley will ultimately have to pay it, at her behest.

Ms. Stanley did not cite any case law or other authority to support her contention. In contrast, Mr. Stanley cited Paulus v. Paulus (In re Paulus), 2011 WL 2560285, *3 (Bankr. N.D. Ohio, June 28, 2011), which squarely supports his position and the conclusion reached by the Court. To that the Court will add Wodark v. Wodark (In re Wodark), 425 B.R. 834, 840 (10th Cir. BAP 2010); Reinhardt v. Reinhardt (In re Reinhardt), 478 B.R. 455, 457 (Bankr. M.D. Fla. 2012); Damschroeder v. Williams (In re Williams), 398 B.R. 464, 469 (Bankr. N.D. Ohio 2008); Beggs v. Niewdach (In re Beggs), 314 B.R. 401, 417 (Bankr. E.D. Ark. 2004); Ruhlen v. Montgomery (In re Montgomery), 310 B.R. 169, 178 n.7 (Bankr. C.D. Cal. 2004); Dressler v. Dressler (In re Dressler), 194 B.R. 290, 304 (Bankr. D.R.I. 1996).

In addition to the applicable statutory language, and the case law cited, practical considerations bear out the Court's conclusion. Any of the four creditors to whom Ms. Stanley is jointly liable will still be able to pursue their collection efforts against Ms. Stanley, even if Mr. Stanley's direct, personal liability to that creditor is not discharged, regardless of the terms of the divorce decree, which does not bind them in the least. On the other hand, to deny Mr. Stanley's right to discharge debts for which Ms. Stanley is not jointly liable would not serve to accomplish the purpose of the marital debt provisions of the divorce decree which is to keep her from having to pay debts she would otherwise be responsible for.

The result encouraged by Ms. Stanley in this case is contrary to the function of bankruptcy, which, with respect to divorce created obligations, is to prevent a debtor from discharging certain debts, not to insure the debtor fulfills them. The latter objective can only be accomplished in state court, under state law, according to the mechanisms provided thereby.

In conclusion, with respect to Ms. Stanley's contention that 523(a)(15) precludes Mr. Stanley from discharging his personal, direct liability to First National Bank of Omaha, Discover Bank, CitiBank and Bank of America, as opposed to his liability to her, under the terms of the divorce decree, to hold her harmless with respect to the debts owed to those creditors, Mr. Stanley is entitled to judgment as a matter of law.

## 2. Shealy & Holt and Eyemart Express

Mr. Stanley contends that his obligation to pay the debts owed to Shealy & Holt and Eyemart Express are, despite section 523(a)(15), dischargeable because he was commanded to pay those creditors directly, as opposed to giving the money to Ms. Stanley for her to pay them. In that circumstance, a majority of courts have held that a "direct pay to third parties obligation" created by a divorce decree is nondischargeable pursuant to section 523(a)(15) based on the legal reality that the obligation to pay such debts was created by the divorce decree, and is actually owed to and for the benefit of the spouse whose debts are to be paid, and would not exist but for a duty to settle property rights owed to that spouse under state law, and can be enforced by that spouse in the state domestic courts. Wodark v. Wodark (In re Wodark), 425 B.R. 834, 840 (10th Cir. BAP 2010); Gibson v. Gibson (In re Gibson), 219 B.R. 195, 205 (6th Cir. BAP 1998); Zimmermann v. Hying (In re Hying), 477 B.R. 731, 735 (Bankr. E.D. Wis. 2012); Morris v. Allen(In re Morris), 454 B.R. 660, 663 (Bankr. N.D. Tex. 2011); Clair, Griefer LLP v. Prensky (In re Prensky), 416 B.R. 406, 411 (Bankr. D.N.J. 2009); Damschroeder v. Williams (In re Williams), 398 B.R. 464, 469 (Bankr. N.D. Ohio 2008); Burckhalter v. Burckhalter (In re Burckhalter), 389 B.R. 185, 191 (Bankr. D. Colo. 2008); Beggs v. Niewdach (In re Beggs), 314 B.R. 401, 417 (Bankr. E.D. Ark. 2004); Ruhlen v. Montgomery (In re Montgomery), 310 B.R. 169, 180 (Bankr. C.D. Cal. 2004).

Under Alabama law, a party may enforce the other party's obligation to pay marital debts directly to third-party creditors in the state divorce court. In Kaleta v. Kaleta, 452 So.2d 1338, 1339 (Ala. Civ. App. 1984), a divorce judgment approved and ratified an agreement of the parties in which the husband agreed to pay the wife's father the sum of $5,000, which represented the balance of a loan made to the parties. The husband failed to pay the loan balance as agreed. The wife filed a complaint for a rule nisi seeking to enforce that provision of the divorce judgment. The trial court entered judgment for the wife and against the husband for $5,000 for the use and benefit of the wife's father. In upholding that judgment, the Alabama Court of Civil Appeals stated:

> It is within the discretion of a trial court to require that one spouse assume and pay one or all of the marriage debts. Bryant v. Bryant, 401 So. 2d 65 (Ala. Civ. App.), cert. denied, 401 So. 2d 67 (Ala. 1981); Smythe v. Smythe, 376 So. 2d 1101 (Ala. Civ. App.1979); Patterson v. Patterson, 372 So. 2d 329 (Ala. Civ. App.), cert. denied, 372 So. 2d 330 (Ala. 1979); Wilson v. Wilson, 53 Ala. App. 194, 298 So. 2d 616 (Ala. Civ. App. 1973), cert. denied, 292 Ala. 759, 298 So. 2d 622 (1974). Where that is done, no valid reason has been presented to us as to why the other spouse cannot enforce the judgment. This is especially true where the debt was "for a loan made to the parties," as was recited in the agreement-judgment in this case. In the absence of fraud, duress, or other similar reasons, both parties are, between themselves, precluded from collaterally attacking that clause. Accordingly, the wife has a vital

11

> interest in the repayment by the husband of her father's loan to them and she may enforce the payment thereof.
>
> Since the husband had not paid the debt as ordered by the divorce judgment, the method of enforcement of the judgment which was utilized by the trial court was permissible. Under rule 71 of the Alabama Rules of Civil Procedure, a court order may be made in a divorce case in favor of a person not a party, but the creditor would have no standing to enforce it under the divorce judgment. Wilson v. Wilson, supra. However, the benefitted former spouse may attempt to enforce its judgment. Under the 1983 judgment in favor of the wife for the use and benefit of the creditor, if she received any payments upon the judgment, the proceeds would belong to her father. In effect, it was not a personal judgment for the wife, but was one for her father.

452 So.2d at 1339-1340.

In accordance with the cases cited, the Court concludes that Mr. Stanley's contention is without merit and that his obligations to pay the debts to Shealy & Holt and Eyemart Express are nondischargeable pursuant to 11 U.S.C. § 523(a)(15). Consequently, with respect to that legal issue, Ms. Stanley is entitled to judgment as a matter of law.

### B. Section 707(b) contentions

The Court disagrees with Ms. Stanley's section 707(b)(1) & (3) contentions. Section 707(b)(1) provides that "[a]fter notice and a hearing, the court ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of this chapter ...." 11 U.S.C. § 707(b)(1). Section 707(b)(3) provides that "[i]n considering ... whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider – (A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3).

Ms. Stanley's contention in her complaint is that Mr. Stanley's petition was filed in bad faith because its purpose was to get out of the obligations he committed to in the agreement which is the basis of their divorce decree. Because the facts that she bases that contention on are not contested, there are no genuine issues as to any material facts which have to be resolved for that issue to be decided.

12

It is, of course, by statutory fiat, impossible for Mr. Stanley to discharge his divorce obligations by filing bankruptcy. Consequently, it cannot be inferred that Mr. Stanley intended to avoid those obligations by filing his bankruptcy petition. Speculation regarding the objective he sought to achieve in filing his petition must be limited to the realm of the possible, that is to discharge his personal liability to individual creditors other than Ms. Stanley, which is a legitimate and legally authorized and encouraged use of chapter 7. Consequently, Ms. Stanley's argument that Mr. Stanley filed bankruptcy to dissolve his divorce obligations must be rejected; however, that conclusion does not fully resolve Ms. Stanley's bad faith argument.

In the brief Ms. Stanley filed in opposition to Mr. Stanley's summary judgment motion, she advanced an alternative argument, that is, Mr. Stanley's chapter 7 petition was filed in bad faith because he has the financial wherewithal to pay his debts. Her support for that contention lies in her observation that Mr. Stanley, according to the information in his bankruptcy petition, earned $3,233.60 a month in 2012; her opinion that he has "very little necessary expenses;" and the fact that in 2012 he owned Publix stock worth $20,288.75 and had $3,368.29 in his 401k account. A.P. Doc. 30. No evidence was offered on how Ms. Stanley arrived at her opinion with respect to Mr. Stanley's expenses, and none was provided on any particulars of the same. Ms. Stanley did not seek to analyze the income and expense breakdown provided by Mr. Stanley with his petition, or contend that any of those figures are inaccurate, false, incredible, unreasonable, or unnecessary.

Schedule I of Mr. Stanley's petition, entitled "Current Income of Individual Debtor," indicates that although he earns $3,053.04 a month, he takes home $2,233.19 after deductions for taxes, social security, and insurance. In his Schedule J, entitled "Current Expenditures of Individual Debtor," Mr. Stanley lists $2,271.65 in current monthly expenditures, which leaves him with no money to pay his creditors, contrary to Ms. Stanley's assertions. The same holds true with respect to the results of Mr. Stanley's "Chapter 7 Statement of Current Monthly Income and Means-Test Calculation." Consequently, no basis exists for determining that Mr. Stanley has the income to pay his debts, or, for that matter, any part of them.

The result is the same in regard to Ms. Stanley's contention that Mr. Stanley can pay his debts because in 2012 he owned $20,288.75 in Publix stock and had $3,368.29 in his 401k account. Mr. Stanley asserts, in his brief, that the stock is part of his retirement account which is exempt from creditors. Indeed, an asset he listed in his petition was an interest in a pension plan through Publix valued at $25,432.75, which amount has no doubt been reduced by the subsequent transfer to Ms. Stanley pursuant to the QDRO. Mr. Stanley represents that the Publix stock is included in that figure, and he claimed it as exempt in his Schedule C, pursuant to Code of Ala., 1975, § 19-3B-508. That provision exempts "Qualified Trusts under the Internal Revenue Code" from the claims of creditors. Neither the trustee, nor Ms. Stanley, nor any other party in interest questioned or objected to that claim of exemption. Mr. Stanley did not list any other stock in his schedule of assets, and the trustee in his bankruptcy case has

reported to the Court that Mr. Stanley has no nonexempt property from which a distribution to creditors can be generated.

The document on which Ms. Stanley is relying to support her contention that Mr. Stanley owns the stock is a letter from Publix's "Profit Plan Analyst," Ms. Tammy Hanson. A.P. Doc. 30, Exhibit 45. That letter reflects that Mr. Stanley's interest in the stock is part of an "Employee Stock Ownership Program." The document does not reflect that Mr. Stanley's interest in the ESOP is not a "qualified trust" exempt from the claims of creditors pursuant to Code of Ala., 1975, § 19-3B-508, or otherwise detract from that conclusion. It does not, therefore, constitute evidence that Mr. Stanley's interest in the ESOP is not exempt, which conclusion is supported by his claim that it is, and the fact that no one has contested that claim. Moreover, the closeness of the combined total of the figures for both the 401(k) and ESOP in the letter to that listed by Mr. Stanley in his petition for his retirement plan indicate that the petition was intended to include both the ESOP and 401(k) "SMART Plan" account balances referred in the letter. Furthermore, the letter that was sent by Ms. Young on August 18, 2011, clearly informed that "... tax qualifying retirement plans generally are protected from the creditors of plan participants and their beneficiaries," and that "[t]he anti-alienation provisions of ERISA, ERISA § 206( d) and 26 U.S.C. § 401(a)(13), protect tax qualified retirement plans from the claims of creditors and prevent the attachment of liens against the assets in such plans," and that "... both the ESOP and the 401(k) Plan [that Mr. Stanley had interests in] contain anti-alienation provisions as required by ERISA and thus prohibit any transfer of benefits or interest in those plans." A.P. Doc. 34, Exhibit 30 (parentheticals added). Those statements indicate that both the 401(k) plan and ESOP are part of Mr. Stanley's "tax qualifying retirement plan."

No proof has been offered that Mr. Stanley has separate nonexempt stock that he failed to list on his petition, or that the Publix stock is not part of his retirement fund, or was not included in the $25,435.75 he claimed as exempt in his bankruptcy petition, or is not really exempt pursuant to Code of Ala., 1975, § 19-3B-508. The above letter is not sufficient in those regards. The Court must conclude then that Mr. Stanley owns no nonexempt stock. With that conclusion, this Court does not know of any legal authority that supports the proposition that a debtor's failure to liquidate exempt property to pay his or her creditors constitutes an abuse of chapter 7. Furthermore, Ms. Stanley has not submitted authority which suggests that Mr. Stanley could reach and liquidate his ESOP interest if he wanted to. And finally, even if Mr. Stanley had owned $20,288.75 in nonexempt stock, and that amount had been liquidated by the trustee and distributed to creditors, it would have been insufficient to satisfy even his priority tax debts, leaving him nothing to pay the remaining $70,000 in nonpriority, unsecured debts that he listed in his petition. Therefore, it cannot be determined, by any stretch of the imagination, that the totality of the circumstances of Mr. Stanley's financial situation demonstrates an abuse of the bankruptcy code or process.

The Court has thoroughly examined the facts which Ms. Stanley contends supports her allegation that Mr. Stanley filed his petition in bad faith. None of those

14

facts support that allegation. They do not, in any respect, suggest that his petition does not accurately reflect his financial condition. His income is modest and there is no proof that his expenses are exorbitant, or even unreasonable, or that they can be reduced significantly. He cannot pay his debts based on his current expenses and living expenses. He does not appear to be paying for any luxury items or to have made any unnecessary eve of bankruptcy consumer purchases or taken out any cash advances. His bankruptcy filing will not permit him to avoid honoring the promises he made to Ms. Stanley in their divorce settlement. Hence he cannot be guilty of primarily filing bankruptcy for the purpose of avoiding those obligations, or of being dishonest with Ms. Stanley with respect to his commitment to undertake those obligations. Furthermore, there is no indication that he has been dishonest with any other creditor either.

Similarly, Mr. Stanley did not cause the arduous and lengthy process of obtaining money from Publix. Ms. Stanley's exhibits do not suggest that there was anything Mr. Stanley could have done. And given the phraseology of the clause in the divorce decree relating to that payment, its no wonder he construed it to require payment within 30 days only if he elected to pay out-of-pocket. Furthermore, how was he to know that the process would take so long? In any event, the fact that it took Ms. Stanley longer than anticipated to get her money, provides no basis for concluding that Mr. Stanley is guilty of bad faith or abuse. The QDRO that was eventually approved by Publix and executed by the circuit court judge authorized a transfer of the full $6,873.23 to Ms. Stanley (the "Alternate Payee") in the following manner:

> 8. As of June 30, 2010, the Participant assigns to the Alternate Payee the amount of $6,873.23, whether pre or post tax is applied. Said amount shall not be reduced by any type of outstanding loan balance of the Participant. The Alternate Payee's share of the benefits will be derived on a pro rata basis from all of the Participant's stock accounts maintained on his behalf under the Plan. <u>The amount awarded shall be invested in the same funding options as invested in the participant's SMART Plan Account at segregation</u>.

A.P. Doc. 34, Exhibit 26 (emphasis added).

Mr. Stanley had no control over the transfer from Publix to Ms. Stanley. The order authorized the transfer of the entire $6,873.23, but that the amount awarded would be "... invested in the same funding options as invested in the participant's SMART Plan Account at segregation," and that for Ms. Stanley to get the money, she would have to direct Publix to liquidate those investments. Upon her receipt of the investment proceeds from Publix, Ms. Stanley would have had to, in turn, write Ms. Cousins a check for her fee. That is the way it was set up. Why Ms. Stanley only received checks totaling $6,156.68, as Ms. Cousins contends, is a matter between her, her client, and Publix. Mr. Stanley was not involved.

15

Case 11-00357-BGC    Doc 46    Filed 03/29/13    Entered 03/29/13 14:13:21    Desc Main
Document      Page 15 of 18

As to the reason Mr. Stanley filed bankruptcy, one need not look past the fact that Ms. Stanley had garnished his bank account to recover the $6,873.23. Furthermore, at the same time he had been sued by Discover Bank for a substantial sum.

## IV. Conclusion

The Court has viewed all evidence and made reasonable inferences in favor of Ms. Stanley. Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995). However, on every issue other than the nondischargeability of the obligations that he incurred to Ms. Stanley by virtue of the divorce decree, the pleadings and records on file in this case, specifically Ms. Stanley's complaint, and brief, and the exhibits attached thereto, which mirror many of the exhibits attached to Mr. Stanley's brief, reflect that there is no evidence to support Ms. Stanley's contentions. Mr. Stanley is, on those issues, therefore, entitled to summary judgment. He need not do anything else to accomplish that result.

## V. Additional Evidence

Although the brief and exhibits submitted by Ms. Stanley provide ample basis for granting summary judgment in Mr. Stanley's favor on the issues indicated above, Mr. Stanley has submitted additional affirmative, unrefuted, and unrebutted evidence which makes it even more unlikely that Ms. Stanley could have proved her case at trial on those issues. The Court did not consider that evidence in reaching its above conclusions; however, that evidence provides additional, albeit unnecessary, support for those conclusions. That evidence also addresses some of the sub-issues the parties raised.

At the hearing of this matter, there was considerable discussion of whether Ms. Stanley was personally liable for any of the four credit card debts listed in the divorce decree. The evidence that she "... had credit cards and charging authority on those cards," was offered for this proposition. A.P. Doc. 30. Documents attached to Mr. Stanley's brief rebut that assertion.

One is a letter to Mr. Keller's law firm, dated March 28, 2012, that was provided in response to a subpoena, from the Custodian of Records for Citibank, NA, which states that "[t]he [AT&T Universal Card] account is in the name of Michael Stanley and Lavaughn Stanley is listed as an authorized user on the account; however Michael Stanley is responsible for the balance. Lavaughn Stanley is just an authorized user on the account." A.P. Doc. 27, Exhibit W (emphasis added).

Another document that is attached to Mr. Stanley's brief is a letter received by Mr. Keller, also in response to a subpoena, from Asset Acceptance LLC, the assignee of the debt owed to First National Bank of Omaha, which resulted from charges made on the Visa card issued by that latter. The letter states:

16

> Ms. Stanley is an authorized user. I am providing collection notes stating that. Once the account was sold our notes indicating when she became an authorized user were deleted. We do not require a formal application to become an authorized user. The request is usually made over the phone by the account owner. The authorized user does not have the financial responsibility for the account.

A.P. Doc. 27, Exhibit V.

The foregoing documents clearly show that Ms. Stanley is not liable for the debts owed as a result of charges made on the Citibank/AT&T Universal and First National Bank of Omaha Visa cards. Her contention, therefore, that Mr. Stanley should not be allowed to discharge his direct obligation to the creditors holding those debts because she will be responsible for those debts is without merit. The same holds true for her contention that Mr. Stanley filed this bankruptcy in bad faith for the purpose, in part, of avoiding his obligation under the divorce decree to pay those debts.

## VI. Miscellany

### A. 523(a)(6) contentions

Ms. Stanley's complaint furthermore contains the following contention: "Debtor/Defendant never disclosed to the Plaintiff that he was in debt counseling in contemplation of filing a Chapter 7 Bankruptcy Petition. Plaintiff avers that such action were willful and malicious and has caused injury to the Plaintiff in violation of [11 U.S.C. §] 523(a)(6)." A.P. Doc. 1. That contention contains no allegation that Mr. Stanley either caused or committed any physical injury either to Ms. Stanley's person or any item of property owned by her. Moreover, there is a complete absence of any evidence in the record which suggests any such thing. Furthermore, Ms. Stanley has failed to produce any evidence which suggests that Mr. Stanley, willfully or otherwise, either caused or committed any physical injury to her or to property owned by her. Mr. Stanley is, therefore, on that issue, also entitled to summary judgment.

### B. Bates Avenue Property

Ms. Stanley's complaint also prays for this Court not to set aside Mr. Stanley's transfer to her of his interest in the Bates Avenue property. She has suggested no basis that Mr. Stanley would have to set aside that transfer or that he intends to try to, or has threatened such an attempt. Furthermore, Mr. Stanley has sought no such relief and has no apparent basis for doing so. Moreover, he has not suggested that he intends to endeavor to have that transfer set aside or contended that it should or can be set aside. This Court is empowered to try only actual cases and controversies. "The Constitution limits the jurisdiction of the federal courts to actual cases and controversies. To satisfy the case or controversy requirement of Article III, a plaintiff must have suffered some actual injury that can be remedied or redressed by a

17

favorable judicial decision." Crown Media, LLC v. Gwinnett County, GA, 380 F.3d 1317, 1324 (11th Cir. 2004)(quoting Nat'l Adver. Co. v. City of Ft. Lauderdale, 934 F.2d 283, 285-86 (11th Cir. 1991)(internal citations omitted)). Since no one is trying to set aside the transfer of the Bates Avenue property, Ms. Stanley has suffered no actual injury with respect to any such transfer or proposed transfer. Consequently, the Court lacks subject matter jurisdiction to consider that particular claim. It must, therefore, be dismissed.

### C. 523(a)(5) contentions

There was some question at the hearing as to whether Ms. Stanley was going forward with her section 523(a)(15) contentions. Whether it was intended to be prosecuted or not, it has been considered above.

And in the context of section 523(a)(5), the result is the same. Both make divorce obligations nondischargeable and neither can be employed to render Mr. Stanley's personal, direct liability to First National Bank of Omaha, Citibank, Discover Bank, and Bank of America, which he incurred outside of the divorce decree, nondischargeable. Furthermore, there is no evidence in the record to support Ms. Stanley's contention that the obligations imposed on Mr. Stanley in the divorce decree are "domestic support obligations," as opposed to nonsupport obligations which are nondischargeable by virtue of 523(a)(15), and she offered no such proof in connection with the present motion. Simply calling them "domestic support obligations" does not suffice as evidence that they are.

An Order will be entered contemporaneously with this Memorandum Opinion.

Dated: March 29, 2013           /s/Benjamin Cohen
                                BENJAMIN COHEN
                                United States Bankruptcy Judge

BC:sm